NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-679

ADOPTION OF MAE (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees entered in the Juvenile Court adjudicating them unfit to parent their two youngest daughters, Mae and Cynthia (together, the girls), and terminating their parental rights.[2]  The mother contends that the Department of Children and Families (department) failed to make reasonable efforts to reunite her with the girls.  Both the father and the mother contend that the judge erred in finding them unfit and terminating their parental rights.  We affirm.

---

[1] Adoption of Cynthia.  The children's names are pseudonyms.

[2] The mother and the father's oldest daughter was also a subject of the department's care and protection petition.  She was returned to the mother's custody at age sixteen as a result of her personal growth and independence, which made her less reliant on the mother's care.  The oldest daughter was dismissed from the proceedings and is not a subject of this appeal.

Background.  The dating relationship between the mother and the father began around 2000.  Their oldest daughter was born in 2005 at thirty-two weeks gestation and was hospitalized for about one month before being released to her parents.  Although the department became involved with the family at this time, the oldest daughter remained in her parents' custody.  Mae was born in 2016, and three months later a 51A report was filed, see G. L. c. 119, § 51A, when the child was hospitalized due to low body weight and failure to thrive.  The department assigned the mother the first of many service providers, a parent aide, to come to the home twice weekly.  Cynthia was born in 2017.  Five months later, another 51A report was filed alleging neglect of all three children by both parents.

The mother's and the father's relationship was "permeated" with verbal abuse, especially when the father drank alcohol, and sometimes with physical abuse.  Alcohol and drugs were regularly present in the home.  The father in particular abused alcohol, smoked marijuana daily, and used cocaine.  The father did not visit or check on Mae's status when she was hospitalized as an infant, and he was not present for Cynthia's birth.

The judge found that the mother "suffers from mental health deficits and significant cognitive limitations, which impact her ability to understand, process or recall certain information." In addition, the mother was involved in a serious car accident

2

in 2012, which resulted in a traumatic brain injury (TBI).  She also suffers from depression, anxiety, and posttraumatic stress disorder.  The mother's condition negatively affected her ability to care for the girls.  When Mae was born and failed to gain weight, the mother had difficulty preparing formula and did not know what to do when the child vomited.

The department took emergency custody of all three children in May 2018, when the oldest daughter was twelve years old, Mae was not yet two, and Cynthia was six months old.  During home visits in the preceding month, the mother had been lethargic and had trouble staying awake.  The younger girls were inappropriately clothed for the weather and were left to sleep in precarious or dangerous conditions.  The mother admitted to hitting the father because he had been having an affair with a neighbor.  This neighbor and another neighbor were known drug users and regularly were present in the family's home.  The father submitted to a urine test that was positive for cocaine. The children were removed because of safety concerns and the use of controlled substances in the home.

During the ensuing care and protection proceedings, the department provided the mother with a wide variety of aides and services, yet she was unable to retain information she was taught to improve her parenting skills or even to understand her own condition and limitations.  She struggled with basic

3

parenting tasks, such as remembering to change the girls' diapers, and with understanding the girls' needs, from appropriate foods to their medical conditions. The girls displayed behavioral issues during visits, such as throwing rocks and swearing, and the mother was unable to respond appropriately. The judge found that the department's concerns regarding the mother's "retention of information and her ability to assess risk and safety in the moment, to adapt to the developmental changes of the girls, which concerns will evolve and change" to be well warranted. The mother's cognitive deficits also made her "an easy target for fraud and manipulation" by scammers and the father. The judge concluded, "Despite engaging in a plethora of services, Mother has not demonstrated observable change to demonstrate she can parent her children. Mother's limitations are reasonably likely to continue into the indefinite future."

The father was "aggressive, defiant and combative," and blamed the department and medical providers for his and the girls' problems. He declined having the girls visit him when he was incarcerated from November 2019 to May 2020, and he did not make efforts to revive contacts with them until March 2021. Once resumed, his visits with the girls went well. However, the father refused to engage in any relevant services offered by the department, including relationship counseling with the mother

4

and services to address domestic violence, substance use, or his history of anger, aggression, and hostility toward the mother. He repeatedly threatened department employees. The judge found him unfit to parent the girls, and that his unfitness was unlikely to be abated:

> "Father's resistance, if not outright refusal or unwillingness to engage in services, all of which are designed to improve his parental ability, is strong evidence of his incapacity to appreciate and perform the obligations resting upon a parent. Moreover, Father's character and temperament, as demonstrated by his criminal history, behavior towards his family, and his anger and aggression directed at Mother and the Department renders him incapable of providing a safe and stable home environment. Father's assaultive behavior towards his supports will continue indefinitely until Father decides to seek consistent treatment to address his ongoing assaultive and substance abuse related concerns."

The girls have lived with their preadoptive family since August 2021, where they have thrived. The preadoptive parents support the girls' maintaining ties with their biological family, but because the preadoptive parents "could not say with certainty that they would provide visitation with Father," the judge ordered posttermination and postadoption visitation with the girls for the mother and the father, separately, and between the girls and their older sister, for a minimum of one hour at least three times per year.

Discussion. 1. Reasonable efforts. "Where a parent, as here, has cognitive or other limitations that affect the receipt of services, the department's duty to make reasonable efforts to

preserve the natural family includes a requirement that the department provide services that accommodate the special needs of a parent." Adoption of Ilona, 459 Mass. 53, 61 (2011). "The department must 'match services with needs, and the trial judge must be vigilant to ensure that it does so.'" Id., quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 279 n.3 (2002).

The mother argues that the department failed to make reasonable efforts to reunify her with the girls because it did not provide services specifically tailored to address her cognitive limitations and TBI. She further claims that the judge failed to be "vigilant" in ensuring that appropriate services were provided. We disagree.

At the outset, we reject the department's and the girls' assertions that the mother waived this issue. The mother requested special accommodations for her cognitive limitations, and the department held three Americans with Disabilities Act (ADA) meetings in response. This satisfied the mother's obligation to put the department on notice of the claim, and it gave the department the opportunity to remedy any inadequacies of the services. See Adoption of West, 97 Mass. App. Ct. 238, 242 (2020). Even if the mother "could have raised the issue more pointedly at trial, the extent to which available supports could have compensated for the mother's cognitive deficiencies

6

was a theme that ran through the life of the case." Adoption of Chad, 94 Mass. App. Ct. 828, 839 n.20 (2019).[3]

Indeed, the judge's findings of facts and conclusions of law detailed vast efforts made by the department to provide appropriate services to the mother to help her care for the girls and, after they were removed, to assist her with learning parenting skills in light of her limitations. As soon as Mae was released from the hospital as an infant, the department provided a parent aide to make home visits. A visiting nurse was provided to educate the mother on "swaddling, feeding, and mixing formula." For the next sixteen months, until the girls were removed from the mother's home, the department provided "a plethora of services, including an in-home therapy team, parent aide, early intervention and collateral contact with medical providers."

Services continued after the department obtained custody of the children. The judge assigned a guardian ad litem (GAL) "to

_____

[3] Although we consider the mother's reasonable efforts claim to be preserved, we reject any suggestion that the judge's obligation to be "vigilant" requires any sort of hands-on supervision of the services the department provides. "[T]he department has discretionary authority regarding which particular services to recommend, and how those services shall be provided." Care & Protection of Rashida, 488 Mass. 217, 229 (2021). A parent may bring a judge's attention to the department's failure to provide a particular service or services through a so-called "abuse of discretion" motion. See id. at 221, 228-229. The judge has no independent duty to supervise the department's provision of services.

assist Mother in her presentation of her case and in advocating for Mother with regard to her disability."  The GAL "participated in treatment meetings, home visits, foster care review meetings, ADA meetings, team meetings, and court dates."  A private social worker was also retained to assist the mother during the case.  Over the life of the case, the department provided at least four parent aides for a total of twenty-seven months of service.  The department provided tailored assistance to the mother, including transportation to medical appointments for herself and for the oldest daughter; help in coordinating the oldest daughter's care; transportation to visits with the girls; and assistance with scheduling and routine parenting skills.

Because of her TBI, the mother requested accommodations from the department under the ADA.  The department convened the mother and her representatives for three ADA meetings.  After the first meeting, held in March 2019, the parties developed a number of recommendations to accommodate the mother's cognitive limitations in caring for the children and to explore services available from other agencies and providers.  "Team meetings" were held "at least monthly" to assist the mother in engaging with the girls.

Among the recommendations at the first ADA meeting was for the mother to obtain a neurological evaluation to facilitate her

application for additional services.  With the department's and the GAL's help, the mother was evaluated in December 2019 by Dr. Walbridge.  At the second ADA meeting, in July 2020, the parties discussed how to implement Dr. Walbridge's recommendations.  One of those recommendations was for the mother "to obtain a service that could provide daily substantial, ongoing functioning support" in caring for the girls.  The department and the mother's team "searched for such a service to no avail.  Indeed, by all accounts, the type of service Mother requires does not exist."  A third ADA meeting was held in March 2021 "to continue to review and monitor the progress towards implementing the recommendations from the previous meetings."

In addition, the department placed a referral for case management services through the Statewide Head Injury Program (SHIP).  The department social worker "believed the SHIP program could work with Mother in coping with any side effects of her TBI diagnosis."  The application was delayed and eventually denied in August 2021, apparently for lack of documentation of the mother's TBI.  Inexplicably, neither the department nor the GAL attempted to obtain such documentation, which would seem to have been readily available.[4]

---

[4] The judge's findings suggest that the mother hampered the department's ability to rectify the situation because she failed to provide the department social worker with documentation of, or the reason for, the denial.

Nonetheless, the judge concluded that the department "provided ample services specifically tailored to meet Mother's needs and designed to improve her parenting." We are satisfied that, despite its failure to follow through with the SHIP application, the department met its burden of proving reasonable efforts by a preponderance of the evidence. See Care & Protection of Rashida, 489 Mass. 128, 137 (2022).

Moreover, the judge was cognizant of Dr. Walbridge's opinion that the mother had "the capacity to be a good parent as long as she has substantial, ongoing services in and outside of the home to support her," but that she could not function on her own. However, the judge found that support of the intensity and duration that the mother needed to assist her in caring for the girls simply was not available. See Adoption of Lenore, 55 Mass. App. Ct. at 278 ("heroic or extraordinary measures, however desirable they may at least abstractly be, are not required").

2. Unfitness and termination of parental rights. To terminate parents' rights with respect to their children, the department must show, and the judge must find, by clear and convincing evidence that the parents are unfit and that terminating their legal bonds with the children will be in the children's best interests. See Adoption of Yvonne, 99 Mass. App. Ct. 574, 576-577 (2021). "The judge must not only find

10

that the parent is currently unfit, but must also find that the current parental unfitness is not a temporary condition." Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60. We review the judge's determination of the girls' best interests for abuse of discretion or clear error of law. See Adoption of Hugo, 428 Mass. 219, 225 (1998). We discern no error or abuse of discretion in the judge's conclusions, discussed supra, that the mother and father were unfit to parent the girls and that their unfitness was likely to continue indefinitely.

The judge determined that the father was unfit, and that the girls' best interests would be served by termination of his parental rights, based on a variety of factors, including his past and ongoing drug and alcohol use; his incarceration record; his lack of interest in parenting or visiting with the girls; his aggression toward, and manipulation of, the mother; and his refusal to engage in services to ameliorate his shortcomings as a parent and the conditions creating a risk of harm to the girls. The judge's assessment of the credibility of the witnesses and the weight of the evidence is entitled to

11

substantial deference.  See Adoption of Hugo, 428 Mass. at 225.
The record supports the judge's conclusions -- the father
"simply views the evidence differently from how the judge viewed
it."  Adoption of Lisette, 93 Mass. App. Ct. 284, 295 (2018).

Likewise, the record supports the judge's conclusions as to
the mother.  "A parent may be found unfit because of mental
deficiencies, but only where it is shown that such 'deficiencies
impaired her ability to protect and care for the children.'"
Adoption of Chad, 94 Mass. App. Ct. at 838, quoting Adoption of
Quentin, 424 Mass. 882, 888-889 (1997).  After a careful and
painstaking review, the judge found that the mother's cognitive
limitations and the effect of her TBI, "complicated further by a
history of learning disabilities throughout her childhood years
and her diagnoses of depression and anxiety," rendered her
incapable of parenting Mae and Cynthia.  While the mother points
to some evidence in the record that she, on occasion, could
respond appropriately to the girls' needs, the judge weighed the
evidence differently.  The judge made "specific and detailed
findings demonstrating that close attention ha[d] been given the
evidence."  Adoption of Leland, 65 Mass. App. Ct. 580, 583
(2006).  Those findings are entitled to our deference.

In light of the mother's limitations, it is important to
note that the judge also found that no family member or friend,
nor the father, was available and capable of providing the

12

mother with the substantial support she would need to care for the girls -- and herself.  See Adoption of Darlene, 99 Mass. App. Ct. 696, 707 (2021) (affirming termination of parental rights where mother testified she would "need a lot of help" to raise child, but supports were not available).  Contrast Adoption of Chad, 94 Mass. App. Ct. at 839 (remanding for judge to consider "whether, with available assistance, the mother would be able to leverage the outside support that both children plainly need").

The judge found that the mother loves Mae and Cynthia, but "[u]nfortunately, love is not enough to raise a child." "Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother and father do not love the [girls]."  Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017).  "The inquiry instead is whether the parents' deficiencies or limitations place the child[ren] at serious risk of peril from abuse,

neglect, or other activity harmful to the child[ren]" (quotation and citation omitted).  Id.  Sadly, they do.

Decrees affirmed.

By the Court (Massing, Singh & Grant, JJ.[5]),

_(signature)_

Assistant Clerk

Entered:  April 19, 2024.

---

[5] The panelists are listed in order of seniority.

14