NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1397

ADOPTION OF MICAH (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from decrees of a judge of the Juvenile Court finding the mother unfit to parent and terminating her parental rights with respect to her two youngest children, twins Micah and Vanessa. The mother contends that the Department of Children and Families (department) failed to prove by clear and convincing evidence that the mental health and substance use issues that rendered her unfit were permanent and that the department failed to make reasonable efforts to address these issues. We affirm.

Background. As a child, the mother was removed from her parents' home due to allegations of traumatic abuse by her father. She later earned two associate degrees from Greenfield Community College in 2004 and a bachelor of science degree from

---

[1] Adoption of Vanessa. The children's names are pseudonyms.

the University of Rhode Island in 2007.  Her first child was born in 2013 and her second child was born in 2018.  The older children have different fathers; at the time of trial, each child was in his father's custody.  Micah and Vanessa, the subjects of the decrees before us, were born in November 2020. The identify of their father is unknown.

The mother became involved with the department as an adult in March 2017, after she was arrested for operating a motor vehicle under the influence of alcohol.  She told the arresting officers that they had to release her because her oldest son, then three years old, was home unattended, but later said that the boy was with his father.  The father obtained custody of the child after this arrest.  From this time forward, the mother's difficulty in coping with the loss of custody of her son, various mental health disorders, misuse of prescription substances, delusional thinking, multiple arrests, and mental health commitments impaired her ability to care for her children.

In August 2018, the department received a report that the mother was using Adderall while breastfeeding her second son, who was two weeks old at the time.[2]  Shortly thereafter, she

---

[2] In 2014, the mother was diagnosed with attention deficit hyperactivity disorder (ADHD) and was prescribed Adderall.

failed to take the child to his scheduled pediatrician appointment and failed to appear at a court hearing. In the following month the baby's father repeatedly reported to the department that the mother was neglecting the baby. The department confirmed that the mother had sent the father messages threatening to harm the father, kill herself, and abandon the child.

In January 2019, the mother was involuntarily hospitalized for nineteen days after a court psychologist reported erratic behavior, irrational thinking, and misuse of Adderall, which caused symptoms of psychosis. The second child's father was called to take custody. The mother was arrested in May 2019 on an outstanding warrant and hospitalized for a second time, where she was diagnosed with Adderall misuse disorder manifesting psychotic symptoms. The second child's father was granted temporary custody.[3] In June 2019, the mother was arrested for violating an abuse prevention order that one of the fathers had obtained.

When the mother was pregnant with Micah and Vanessa, at a meeting of her service providers -- including a department social worker, a re-entry case manager from the house of corrections, and a Department of Mental Health (DMH) case

---

[3] He was granted permanent custody in December 2019.

manager -- the mother disclosed that she had been prescribed Adderall and had taken LSD. Shortly before the birth of Micah and Vanessa, the mother was involuntarily hospitalized for a third time after displaying delusional behavior at an OB-GYN appointment.

Because the mother's interactions with the department while pregnant with Micah and Vanessa demonstrated that she suffered from serious, unaddressed mental health issues and was not thinking rationally, the department removed them from the mother's care in the hospital five days after their birth in November 2020. Since then, they have remained in a kinship foster placement, a two-parent household with two other children. The department's February 2021 family action plan for reunification recommended that the mother engage in therapeutic and support services, including individual therapy and DMH services. It also recommended that she complete a neuropsychological evaluation, undergo a medication evaluation, and sign necessary releases to allow the department to monitor and assess her progress. However, the mother signed only limited releases and noted she did so "under duress," which prevented the department from verifying her treatment or diagnoses. The mother told the department she had completed a neuropsychological evaluation, but the department never received

4

a copy. She stopped engaging with DMH services because she felt they were not helpful.

Meanwhile, the mother continued to exhibit delusional and paranoid thinking and missed scheduled drug testing appointments. At some point in the late spring or early summer of 2021, under the guise of taking a twelve year old girl and her friend swimming, the mother took them to a hotel where she met up with a man; the girls were forced to spend the night in the hotel room in the same bed with the mother and her male friend. The mother was hospitalized again in September 2021 and then was held at a correctional center after another arrest for violating an abuse prevention order. The department's action plan for the mother from August 2021 recommended meeting regularly with her psychiatrist and medication prescriber, following all recommendations, and engaging in individual therapy. Because of the mother's mental instability, the department determined that it would be unsafe to allow unsupervised contact with Micah and Vanessa; therefore, all visits took place at the department's office, supervised by a social worker. In October 2021 the department changed the goal for Micah and Vanessa to adoption.

The mother partially complied with her action plan. In December 2021, when a new social worker was assigned to the

case, the mother signed a limited release that allowed the social worker to verify only her attendance at individual therapy sessions, but not diagnosis or treatment.  Only when the trial date neared did the mother allow her department social worker to speak with the provider who prescribed Adderall, but the social worker was unable to verify whether the mother was taking it as prescribed.

The mother's psychological expert testified that the mother "clearly displayed breaks with reality."  He opined that she had posttraumatic stress disorder with complex trauma, rather than Adderall-induced psychosis, which better explained her disconnection from reality.  By the time of trial the mother had also updated her releases to permit her current therapist to discuss her treatment goals and progress, although the therapist was unsure that she could disclose this information because the release had "a lot of crossing out" and the therapist was unsure of its legitimacy.  The goal of therapy at the time of trial was for the mother to build a trusting relationship with the therapist.  During the trial the mother repeatedly interrupted and presented as angry and irrational.

Micah and Vanessa both have developmental delays and receive early intervention services.  Micah also has feeding difficulties, is missing his right pectoral muscle, and has been

diagnosed with right short finger symbrachydactyly, that is, his right arm and hand appear shortened and the fingers on his right hand are fused together. He must see a team of specialists regularly and will require multiple surgeries in the future. Vanessa must wear corrective glasses for her vision and has required the placement of tubes in her ears. Since they were five days old the twins have lived in the same foster home, which is a preadoptive placement. The preadoptive parents have ensured that the twins receive the medical attention they need, and the department supports the goal of adoption by the preadoptive parents.

The judge found that the mother was currently unfit to assume parental responsibility for Micah and Vanessa, that her unfitness "is likely to continue into the indefinite future to a near certitude," and that the best interests of the twins would be served by terminating the mother's parental rights and freeing them for adoption by their foster parents. Although the judge did not credit the mother's expert's testimony that the twins have a secure bond with the mother, the judge did find that the mother's visits "generally go well" and ordered two supervised visits per year.

Discussion. The mother's principal arguments on appeal are interrelated. She argues that the department failed to show by

7

clear and convincing evidence that her mental health disability and substance use had a negative effect on her ability to care for the twins and were not just temporary conditions. Furthermore, she contends that she would have been able to overcome her disability if the department had provided appropriate services and made reasonable accommodations for her, but by not doing so, the department failed to make reasonable efforts to reunify the mother with the twins, as required by Federal and State law. She alleges that this failure violated the Americans With Disabilities Act, the Rehabilitation Act of 1973, and the department's own policies.

A decision to terminate parental rights must be supported by clear and convincing evidence that the parent is unfit, that the parent's current unfitness is not just a temporary condition, and that it would be in the children's best interests to terminate the legal relation between the parent and child. See Adoption of Ilona, 459 Mass. 53, 59-60 (2011); Adoption of Yvonne, 99 Mass. App. Ct. 574, 576-577 (2021); Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). We review the judge's subsidiary findings of fact for clear error and assess the ultimate determination of unfitness and best interests for abuse of discretion or clear error of law. See Adoption of

Ilona, supra at 59; Adoption of Hugo, 428 Mass. 219, 225 (1998); Adoption of Yvonne, supra at 577.

To be sure, "a parent's mental health 'is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs.'" Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021), quoting Adoption of Luc, 484 Mass. 139, 146 (2020). In determining whether mental illness has such an effect, "the judge may consider past conduct to predict future ability and performance" (quotation and citation omitted). Adoption of Jacob, supra at 262. We discern no error or abuse of discretion in the judge's determination that the mother's mental disability, combined with her use of drugs and alcohol, made her unfit to parent the twins and that her unfitness was not a temporary condition.

The mother had been dealing with these issues since the birth of her first child. In addition to making outlandish and delusional statements, she drove vehicles under the influence and made other poor choices. Multiple restraining orders were issued against her, which she repeatedly violated. She was often jailed or involuntarily committed, making her unavailable to care for her children. Although she obtained some services from DMH, reportedly had a neuropsychological evaluation, and

9

periodically engaged in therapy, she did not follow through with services and her condition did not improve. Her instability required her visits with the twins to be supervised. Indeed, as late as the last day of trial she had just barely engaged with her most recent therapist and was only at the remedial stage of trying to establish a trusting relationship with the therapist. "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60. The judge found, and the record supports, that "there have been no substantial changes in her mental health since the beginning of this case, or indeed since the Department's involvement with Mother's older children. As a result, she remains unprepared to care for Micah and Vanessa, especially given their special needs."

The mother, however, attributes her lack of progress to the department's failure to make reasonable efforts. The department is "required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties." Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002). "Where a parent, as here, has cognitive or other limitations that affect the receipt of

10

services, the department's duty to make reasonable efforts to preserve the natural family includes a requirement that the department provide services that accommodate the special needs of a parent." Adoption of Ilona, 459 Mass. at 61.

As a threshold matter, the department and the twins argue that the mother did not preserve her current reasonable efforts claim at the trial level and is therefore precluded from raising it for the first time on appeal. See Adoption of Gregory, 434 Mass. 117, 124 (2001); Adoption of West, 97 Mass. App. Ct. 238, 242-243 (2020).[4] There is some force to this argument. Although the mother filed pretrial motions regarding the department's lack of reasonable efforts, these motions concerned the mother's visitation schedule and did not raise the issue of mental health services. She did not raise the issue during the trial or in her proposed findings of fact submitted at the close of the evidence. On the other hand, the mother's struggles with mental

_____

[4] The mother argues that Adoption of Gregory was wrongly decided because it places the burden on the parent to request reasonable accommodations. We, of course, have no authority to overrule a decision of the Supreme Judicial Court and are bound to follow its decisions. See Commonwealth v. Dube, 59 Mass. App. Ct. 476, 485-486 (2003). Moreover, the requirement that a parent -- or, more specifically, the parent's counsel -- timely raise the issue of reasonable efforts is necessary to "put the department on notice that its efforts may be inadequate, allow the department an opportunity to remedy any problems, and permit the department to defend its efforts at trial." Adoption of West, 97 Mass. App. Ct. at 243.

health were "a theme that ran through the life of the case,"
Adoption of Chad, 94 Mass. App. Ct. 828, 839 n.20 (2019), and
the department did schedule an ADA meeting where it was
determined that the department would assist the mother in
reengaging with DMH and assist the mother's counsel in obtaining
a new medication evaluation for the mother.

In any event, on the record before us, we are satisfied
that the department made reasonable efforts to reunify the
family.  The ADA meeting was one such effort.  In addition, the
department did attempt to assure that the mother would obtain
services from DMH, have a neuropsychological examination,
evaluate and regulate her use of prescription drugs, see a
therapist, and have regular visits with the twins.  The mother
did not avail herself of all of these services, and the
department's efforts were further hindered by the mother's
distrust of the department and refusal to share information.
For example, the mother stopped engaging with DMH services
because she did not believe they were helpful, purportedly
obtained a neuropsychological evaluation but did not make it
available to the department, and stopped seeing a psychiatrist
when the psychiatrist refused to prescribe Adderall.  "The
department's obligation to make reasonable efforts to reunify
the child with the mother is contingent upon her obligation to

12

substantially fulfill her parental responsibilities (including seeking and using appropriate services). . . . [T]he mother did not fulfill these responsibilities here." Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021).

The mother's ADA and related claims fare no better. "[P]roceedings to terminate parental rights under G. L. c. 210, § 3, do not qualify as 'services, programs, or activities' [under the ADA], and thus, the ADA may not be raised as a defense to such proceedings" (citation omitted). Adoption of Gregory, 434 Mass. at 120. The ADA does require that the department provide appropriate services as reasonable accommodations for a parent's disability. See id. "What constitutes reasonable efforts . . . must be evaluated in the context of each individual case." Care & Protection of Walt, 478 Mass. 212, 227 (2017). Because the department satisfied its requirement to make reasonable efforts, it also satisfied the ADA.

Moreover, as the mother notes, a judge may properly terminate parental rights even in the absence of reasonable efforts. See Adoption of Ilona, 459 Mass. at 61 ("even where the department has failed to meet this obligation, a trial judge must still rule in the child's best interest"). The mother argues that Adoption of Ilona violates the ADA and was wrongly

13

decided.  As we noted with respect to Adoption of Gregory, see note 4 supra, we are not at liberty to ignore or overrule a decision of the Supreme Judicial Court.  See Commonwealth v. Dube, 59 Mass. App. Ct. 476, 485-486 (2003).  Nor would we be inclined to do so.  Adoption of Ilona is consistent with both Federal and State law, under which the health and safety of the child are the "paramount" concern.  See Care & Protection of Walt, 478 Mass. at 223-224, 226.

Finally, the mother's claim that the judge improperly considered evidence submitted after trial, showing that the mother had been arrested for operating under the influence, third offense, is without merit.  The department filed a posttrial motion to reopen the evidence, the mother opposed, and the judge allowed the motion in pertinent part.  It was within the judge's discretion to permit the department to submit additional evidence after trial.  See Kerr v. Palmieri, 325 Mass. 554, 557 (1950); Mass. G. Evid. § 611(f) (2024).  Contrary to the mother's suggestion, the judge's exercise of discretion to consider this evidence "demonstrate[s] that close attention

14

has been given the evidence."  <u>Custody of Eleanor</u>, 414 Mass. 795, 799 (1993).

<u>Decrees affirmed</u>.

By the Court (Massing,
  Hershfang & Tan, JJ.[5]),

Clerk

Entered:  March 14, 2025.

---

[5] The panelists are listed in order of seniority.