ADOPTION OF QUENTIN & others.[1]

Suffolk. December 3, 1996. - May 13, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, &
MARSHALL, JJ.

*Parent and Child,* Dispensing with parent's consent to adoption. *Adoption,*
Dispensing with parent's consent. *Evidence,* Child custody proceeding,
Sexual conduct, Hearsay. *Minor,* Custody. *Constitutional Law,*
Confrontation of witnesses. *Witness,* Child.

In a proceeding to dispense with parental consent to adoption, the judge's
findings were supported by the evidence and provided an ample basis for
the judge to conclude that the parents were currently unfit. [886-889]
Discussion of the due process implications of G. L. c. 233, § 82, which
makes admissible in civil proceedings out-of-court statements of a child
under ten years of age describing sexual contact. [889-893]

PETITIONS filed in the Boston Division of the Juvenile
Court Department, three on August 19, 1992, and three on
September 1, 1993, respectively.

The cases were heard by *Stephen M. Limon,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Patricia A. Cantor* for the mother.

*Susan F. Drogin* for the father.

*Brian Pariser* for the Department of Social Services.

*Catherine Booth Correia* for the children.

LYNCH, J. The parents appeal from an order of the Juve-
nile Court awarding custody of their three minor children to
the Department of Social Services (department) and dispens-
ing with their need to consent to adoption. See G. L. c. 210,
§ 3. On appeal, the parents allege that the judge's findings
are not supported by the evidence and, taken together, do not
meet the clear and convincing evidentiary standard necessary

[1]The Department of Social Services (department) filed petitions on behalf
of three minor children, whom we shall call Ellen, Quentin, and John.

to demonstrate current parental unfitness. In addition, the parents claim that the judge erred in admitting out-of-court statements under G. L. c. 233, § 82, a statutorily created exception to the hearsay rule for statements made by a child under the age of ten describing sexual contact. We transferred the case here on our own motion and now affirm.

We summarize the judge's findings. The father and mother are the natural (unwed) parents of Ellen (born in 1987), Quentin (1989), and John (1991). At the time of the proceeding, December, 1994, the father and the mother were thirty-two and thirty-three years old, respectively.

The father was born in San Jose, California, and raised in Oregon. He ran away from home at the age of sixteen. After living on the streets for two years, he joined the Navy. During his service, he was arrested for selling marihuana. He deserted in an attempt to evade the charges, but was arrested, and after a court martial, served five months in "the Naval brig" before being dishonorably discharged.

The father returned to Oregon to live with a woman and their infant daughter, but left after a few months, and has had no further contact with them.[2] He went back to California and resumed his former life-style, living in a public park, and working intermittently. During this period, he regularly used drugs and was promiscuous.

In 1983, the father joined a religious organization called Orlo Templi Orientis and studied the so-called "Satanic Bible." In January, 1984, he was convicted of grave robbing, and sentenced to two months in jail. After release, he returned to his transient life-style, alternating between Los Angeles and San Francisco.

In 1985, the father and the mother met, and soon after started living together. Between November, 1985, and July, 1987, they moved frequently, living in Oregon, California, Texas, Arkansas, Pennsylvania, and Maine. The mother became pregnant with their first child while they were living in Maine. During her pregnancy, the father left and moved to Cambridge. Soon after, the mother lost her job and joined him in Cambridge. Without work, a place to live, and a child about to be born, they returned to California.

---

[2]This child is not involved in this proceeding.

During the next few years the father and the mother managed a residential hotel in California. Their second child, Quentin, was born there. They left their jobs and moved to Colorado in February, 1991; shortly afterward, their third child, John, was born.

In April, 1991, the mother took the children to California to live with her sister. The father moved to Oregon and lived with another woman who "sparked his interest." In November, 1991, the family reunited and moved to Massachusetts with a friend, Michael Switzer. When they arrived, the father lived in his automobile. Unemployed and homeless, the mother and father took the children with them to beg in Harvard Square in Cambridge.

In January, 1992, John was hospitalized. A report was filed pursuant to G. L. c. 119, § 51A (injured child report), alleging neglect due to failure to immunize the children and failure to provide appropriate warm clothing. These allegations were not substantiated. In February, 1992, the family moved into a two-bedroom apartment in Chelsea with Michael Switzer.

In July, 1992, a second injured child report was filed. The investigation revealed that "[t]he children were dirty, the two younger children wore only diapers, a bottle of bleach was within reach of the children, and the hot water heater and pipes were dangerously exposed in the kitchen." Furthermore, the department expressed concern about three adults and three children living in the two-bedroom apartment. An unannounced visit in August found the children dirty, the pipes exposed, and Switzer still living with the family.

During an interview with Dr. Karen O'Connell, a clinical psychologist, the mother indicated that the father had used her public assistance money to buy drugs. She also admitted that she had no power to protect the children from their father's inappropriate behavior. The mother was given an intelligence test by Dr. Michael A. Goldberg with the Boston Juvenile Court Clinic. She scored in the "borderline" range of intelligence, meaning that her verbal performance was "in the high end of the mentally retarded range," and that she had the reading skills of a third grader. Dr. Goldberg concluded that "[she] has cognitive difficulties in processing information, difficulty complying with social norms, low verbal reasoning capacity, inability to remedy stressful situations and, as a

result, that [she] would have difficulty caring for special needs children."

The eldest child, Ellen, was diagnosed as suffering from posttraumatic stress disorder. During an interview with Dr. O'Connell, she stated that "her 'Daddy's a witch;' that 'bad witches took my picture with no clothes on;' that '[Paul, a friend of the father] calls me his girlfriend;' that [Paul] took pictures of her with no clothes on; that [Paul] said not to tell; that she and her mother were tied up together with no clothes on while her father had no clothes on; and that the witches 'shared weenies' and tried to touch her with their weenies but that she ran away." When Quentin was evaluated by Heather Ayers, a licensed clinical social worker who specialized in child trauma, he stated that his mother and father had "kissed my wee wee." He also displayed sexual behavior of a nature that was not normal for his age, such as undressing dolls, licking the dolls' genital areas, saying, "I'll kiss your wee wee," inserting toys in the area between the dolls' legs, and lifting Ayers's skirt and saying, "I see your wee wee." Ayers testified that a three and one-half year old child would not kiss a doll's genital area unless he participated in or observed such behavior. Dr. Catherine Ayoub, a psychologist with the Boston Juvenile Court Clinic, stated that preschool children do not act out or ask others to engage in adult sexual activity of the sort manifested by Quentin as part of normal development. The judge credited Dr. Ayoub's opinion that this behavior is one of the few direct indicators of sexual abuse.

On August 19, 1992, the department was granted temporary custody of the children. When the children arrived in the foster home, they did not know how to brush their teeth, how to brush their hair, how to wipe themselves after using the toilet, or how to eat using utensils. One night, Quentin put his tongue in his foster mother's mouth when she put him to bed. When asked where he learned that behavior, he said his mother and father.

The department referred the mother to classes for parents with learning disabilities and a domestic violence support group, but she refused to attend. In addition, the department arranged for both parents to participate in a parenting group at the Revere Counselling Center, but they refused to attend. The parents did not get along with John Oteri, the department's case worker. They cited their personal animosity to-

ward Oteri to explain why they had not sought information about their children, their development and their needs.

From August, 1992, to December, 1992, the mother visited the children once a week. The children exhibited severe anxiety, aggressive behavior, and emotional distress before and after these visits. As a result, the judge terminated the mother's visitation rights. The children have not seen their parents since December, 1992, and remain in the care of their foster parents, who have expressed an interest in adoption.

*Sufficiency of the evidence.* The parents allege that the judge's findings are not supported by the evidence[3] and taken together do not provide clear and convincing evidence of current parental unfitness. We disagree.

At the outset we note that the judge found that, even in the absence of evidence of sexual abuse by the parents, there was clear and convincing evidence of current parental unfitness. We shall, therefore, review the arguments of the parents without reference to the evidence of sexual abuse. Even with this limitation, the parents' arguments border on the frivolous. In proceedings to dispense with parental consent to adoption, the judge must make specific and detailed findings demonstrating that close attention has been given to the evidence. *Custody of Two Minors*, 396 Mass. 610, 619 (1986). These subsidiary findings must be proved by a fair preponderance of the evidence, *Care & Protection of Laura*, 414 Mass. 788, 793 (1993), and will not be disturbed unless clearly erroneous. *Custody of Eleanor*, 414 Mass. 795, 799 (1993). "Moreover, the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." *Id.* Taken together, these findings must then prove clearly and convincingly that the parents are currently unfit to provide for the welfare and best interests of their children. See *Adoption of Carla*, 416 Mass. 510, 517 (1993); *Adoption of Kimberly*, 414 Mass. 526, 528-529 (1993). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." *Adoption of Mary*, 414 Mass. 705, 711 (1993).

---

[3]Many of the parents' arguments amount to no more than dissatisfaction with the judge's weighing of the evidence and his credibility determinations. We see no basis for disturbing the judge's view of the evidence. *Custody of Eleanor*, 414 Mass. 795, 799 (1993), and cases cited.

In the present case, the judge conducted an extensive hearing over nine days, listened to the testimony of seventeen witnesses, and reviewed thirty-four documents, including investigative reports, clinical evaluations, and reports of psychological testing. We conclude that there was adequate evidence to support the findings that: the parents maintained an unsafe and unsanitary home and failed to take steps to correct these conditions; the parents lived an itinerant life-style which was harmful to the children; they neglected the emotional well-being of the children; the father never displayed a long-term commitment to stay with the family; the father used the public assistance funds to purchase drugs; the mother lacked the ability to protect the children from the father's harmful conduct; and the mother lacked the capacity to deal with the needs of the children. Taken together, these facts provide clear and convincing evidence that both parents were unfit.

"[S]imply because . . . parents embrace ideologies or pursue life-styles at odds with the average" is not a basis for depriving the parents of custody. *Bezio* v. *Patenaude*, 381 Mass. 563, 579 (1980), quoting *Custody of a Minor (No. 2)*, 378 Mass. 712, 719 (1979). However, a judge may consider whether parental behavior adversely affects the child. *Bezio* v. *Patenaude, supra*. See *Custody of a Minor*, 389 Mass. 755, 766 (1983). Here, the children had lived in several different cities by the time the petition was filed. The parents moved to Massachusetts without jobs or a place to stay. The children were forced to beg for money. Moreover, the father deserted the family on at least two occasions. The judge credited testimony indicating that the children "have an ongoing need for a stable and structured home environment to meet their educational, social, therapeutic, medical, and emotional needs." We are satisfied that the judge focused on the adverse effect of the parents' behavior, rather than their life-style choices.

The parents claim that the judge erred in considering that the children had lived with foster parents for over one year and were adjusting well to the situation. "A comparison of the advantage the prospective custodian may offer to the child with those that may be offered by the natural parents is inappropriate." *Custody of a Minor, supra* at 765. However, we have also recognized that "the lengthy separation of a

mother and child and a corresponding growth in the ties between the child and a different custodian may in some circumstances indicate that the forced return of a child to the mother would be seriously detrimental to the child, with the result that the mother should be deemed not fit to care for the child." *Custody of a Minor (No. 2)*, 392 Mass. 719, 724-725 (1984), quoting *Custody of a Minor, supra* at 768. However, there must be specific and detailed findings which demonstrate that returning children to their parents would be detrimental. See *Custody of a Minor (No. 2), supra* at 725 (wholesale adoption of expert testimony insufficient to show parental unfitness). Here, there was evidence that the children exhibited extreme anxiety before and after visits with their mother. Following one visit, John physically abused himself and Quentin exhibited aggressive behavior. Prior to another visit, Ellen "cried, appeared to be scared, agitated, and fearful, and told [the department case worker] to tell [her mother] that she was sick. The next week, [Ellen] again refused to visit her mother . . . yelling, 'You can't make me go.' " Eventually, the judge suspended the weekly visits. The judge credited Heather Ayers's testimony that, for a child to express a desire not to be with a parent, " 'is the most powerful statement a child can make about fears and level of trust' in his parents." We are satisfied that the judge did not weigh the advantages of living with the foster parents against the natural parents; he considered the effect of returning the children to the parents.

The mother argues that the judge erred in considering her mental deficiencies. When assessing parental fitness, it is not enough to state that a parent is mentally impaired, rather there must be a showing that the condition affects the parent's ability to care for the child. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 701 (1984); *Custody of a Minor (No. 2), supra* at 722. Amelia Free and Heather Ayers, licensed social workers who evaluated Ellen and Quentin respectively, testified that these children were suffering from the effects of posttraumatic stress disorder. The judge also heard testimony from Dr. Goldberg that the mother would have difficulty caring for special needs children. The judge noted that the parents thought nothing of watching horror movies with the children. Finally, the mother indicated that she could not protect the children from the

father's inappropriate treatment. See *Adoption of Mary*, 414 Mass. 705, 711 (1993). These findings show that the mother's mental deficiencies impaired her ability to protect and care for the children. We agree that, even absent the evidence of sexual abuse, there was an ample basis for the judge to conclude that the parents were currently unfit.

*Evidence of sexual abuse.* The evidence of sexual abuse fell into three categories: (1) sexualized behavior inappropriate for such young children; (2) expert opinion; and (3) out-of-court statements of the children. The observed behavior included Quentin's "tongue kissing" his foster mother; attempting to look at his female therapist's genitals; and sexualized play with dolls, including kissing, licking, and placing objects in the area of the genitals. These observed events, coupled with the expert testimony credited by the judge that this kind of sexualized behavior does not occur in children so young unless they have seen or experienced it, are some evidence of sexual abuse that does not depend on the out-of-court statements of the children, which further bolsters the judge's finding of parental unfitness.

Because the children's out-of-court statements of alleged sexual contact were not necessary to support a conclusion of parental unfitness, we need not decide the parents' arguments that the admission of these statements is contrary to the due process requirements of the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See *Manor* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 416 Mass. 820, 824 (1994) (constitutional questions should not be decided except as matter of last resort).[4] Because of the importance of the issue, we offer some observations as guidance to courts faced with the problem in the future.

We start with G. L. c. 233, § 82, which makes admissible

---

[4]It is not clear whether the parents preserved the issue. Prior to trial, the father filed a motion in limine arguing that the children were incompetent to testify, but it was denied. The parents did object to the finding that the children were unavailable and the admission of the statements. However, it is not clear that they objected on the ground that G. L. c. 233, § 82, was unconstitutional. See *Adoption of Kimberly*, 414 Mass. 526, 534-535 (1993).

in civil proceedings out-of-court statements of a child under ten years of age describing acts of sexual contact.[5]

In *Opinion of the Justices*, 406 Mass. 1201, 1204 (1989), the

---

[5]General Laws c. 233, § 82, states:

"(*a*) The out-of-court statements of a child under the age of ten describing any act of sexual contact performed on or with the child, the circumstances under which it occurred, or which identifies the perpetrator shall be admissible as substantive evidence in any civil proceeding, except proceedings brought under subparagraph C of section twenty-three or section twenty-four of chapter one hundred and nineteen; provided, however, that such statement is offered as evidence of a material fact and is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; the person to whom such statements was made or who heard the child make such statement testifies; the judge finds pursuant to subsection (*b*) that the child is unavailable as a witness; and the judge finds pursuant to subsection (*c*) that such statement is reliable.

"(*b*) The proponent of such statement shall demonstrate a diligent and good faith effort to produce the child and shall bear the burden of showing unavailability. A finding of unavailability shall be supported by specific findings on the record, describing facts with particularity, demonstrating that:

"(1) the child is unable to be present or to testify because of death or existing physical or mental illness or infirmity; or

"(2) by a ruling of the court, the child is exempt on the ground of privilege from testifying concerning the subject matter of such statement; or

"(3) the child testifies to a lack of memory of the subject matter of the statement; or

"(4) the child is absent from the hearing and the proponent of such statement has been unable to procure the attendance of the child by process or by other reasonable means; or

"(5) the court finds, based upon expert testimony from a treating psychiatrist, psychologist, or clinician, that testifying would be likely to cause severe psychological or emotional trauma to the child; or

"(6) the child is not competent to testify.

"(*c*) If a finding of unavailability is made, the out-of-court statement shall be admitted if the judge further statement [*sic*] was made under oath, that it was accurately recorded and preserved, and there was sufficient opportunity to cross-examine; or (2) after holding a separate hearing and, where practicable and where not inconsistent with the best interests of the child, meeting with the child, that such statement was made under circumstances inherently demonstrating a special guarantee of reliability.

"For purposes of finding circumstances demonstrating reliability pursuant to clause (2) of subsection (*c*) a judge may consider whether the relator documented the child witness's statement, and shall consider the following factors:

Justices analyzed a bill which was the precursor to the statutory scheme now embodied in G. L. c. 233, §§ 81-83. The proposed bill (Senate No. 795) would have allowed out-of-court statements of children under the age of ten who were victims of sexual assault to be admitted in circumstances which did not reach that measure of necessity and reliability found in other hearsay exceptions. *Opinion of the Justices, supra* at 1211, 1216. The Justices were of opinion that the legislation did not strike the proper balance between the State's interest in protecting children and a defendant's right to confrontation embodied in art. 12. *Id.* at 1216-1218.

In 1990, the Legislature enacted G. L. c. 233, § 81 (hearsay statements of child victims in criminal matters), § 82 (hearsay statements of children in civil matters), and § 83 (such statements in foster care proceedings). St. 1990, c. 339.

In *Commonwealth* v. *Colin C.*, 419 Mass. 54, 62 (1994), we analyzed the provisions of § 81 and, in dictum, we indicated that § 81 "seems to address the concerns we expressed in *Opinion of the Justices, supra.*" While emphasizing the importance of a criminal defendant's constitutionally protected right to meet the witness against him face to face, we also "recogniz[ed] that the right to confrontation under art. 12 . . . may yield in appropriate, although limited, circumstances." *Commonwealth* v. *Colin C., supra* at 63, quoting *Commonwealth* v. *Johnson*, 417 Mass. 498, 503 (1994). We approved the requirements outlined in § 81 for demonstrating that the out-of-court statements were necessary and reliable. However, we set out procedural guidelines to ensure fairness in application of the statute. See *Commonwealth* v. *Colin C., supra* at 64-65. In addition, we imposed a further

"(i) the clarity of the statement, meaning, the child's capacity to observe, remember, and give expression to that which such child has seen, heard, or experienced; provided, however, that a finding under this clause shall be supported by expert testimony from a treating psychiatrist, psychologist, or clinician;

"(ii) the time, content and circumstances of the statement;

"(iii) the existence of corroborative evidence of the substance of the statement regarding the abuse including the act, the circumstances, or the identity of the perpetrator;

"(iv) the child's sincerity and ability to appreciate the consequences of the statement.

"(*d*) An out-of-court statement admissible by common law or by statute shall remain admissible notwithstanding the provisions of this section."

requirement that there must be independently admitted evidence that corroborates the out-of-court statement to bolster the finding of reliability. *Id*. at 66. Taken together, the statutory and procedural guidelines, as well as the independent corroboration of the hearsay requirement, would provide sufficient "guarantee of trustworthiness that would justify admitting the [out-of-court] statement as substantive evidence." *Id*. In *Care & Protection of Rebecca*, 419 Mass. 67, 77-79 (1994), we interpreted § 83 as requiring that the evidence be assessed under traditional principles of reliability and corroboration. With these safeguards we concluded that the due process requirements of the Fourteenth Amendment and art. 12 would be satisfied.

These decisions provide a strong basis for concluding that § 82 is not vulnerable to constitutional attack on due process grounds. The section strikes a balance between the parents' due process right to rebut evidence and the State's need to protect children. The requirements outlined in § 82 are analogous to § 81. Both sections provide that an out-of-court statement made by a child under the age of ten related to sexual abuse is only admissible if: (a) a child is unavailable; and (b) the judge makes the additional finding that the statement was reliable, based on a list of enumerated factors.[6] In addition, § 82 requires the judge to consider the existence of corroborative evidence, similar to the requirement we imposed in *Commonwealth* v. *Colin C.*, *supra*. See G. L. c. 233, § 82 (*c*) (iii). Given our dictum approving § 81 with conditions noted, § 82 should survive the same type of constitutional scrutiny. See *Care & Protection of Rebecca*, *supra* at 77 (hearsay evidence admissible under G. L. c. 233, § 83, in care

---

[6]We have noted that judges must strictly adhere to the statutory procedures. See *Commonwealth* v. *Colin C.*, 419 Mass. 54, 64 n.8 (1994).

Contrary to the parents' arguments, it appears that the judge adhered to the statutory directive in this case. The judge held a separate hearing to determine whether the children were unavailable. After hearing testimony from three treating clinicians, the judge made specific findings which demonstrated that testifying would cause severe psychological and emotional trauma to Ellen and Quentin. See G. L. c. 233, § 82 (*b*) (5).

The judge admitted the statements de bene pending a final determination of reliability. Subsequently, the judge made specific findings demonstrating that the out-of-court statements were reliable based on many of the factors indicated in G. L. c. 233, § 82 (*c*), including specific examples of independent corroborative evidence.

and protection proceedings). "Custody proceedings are not criminal in nature and, accordingly, the full panoply of constitutional rights afforded criminal defendants does not apply in these cases." *Custody of Two Minors*, 396 Mass. 610, 619 (1986).

Although a civil case might arise that would not require the full panoply of procedures discussed in *Colin, C., supra*, the better part of caution would be for judges to incorporate these procedures into § 82 proceedings as well. In *Colin C.*, we suggested that the Commonwealth must give prior notice to the defendant that it will seek to use such statements. *Id.* at 64. Second, the Commonwealth must show "by more than a mere preponderance of evidence, a compelling need for use of such a procedure." *Id.* at 64, quoting *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 550 (1988). Third, any separate hearing regarding the reliability of a child witness's out-of-court statement must be on the record and a judge's basis for determining reliability must be supported by specific findings. Finally, there should be independently admitted evidence that corroborates the out-of-court statement. The combination of the statutory requirements and the supplemental procedures outlined in this opinion demonstrates that a sufficient guarantee of trustworthiness would exist that would justify admitting statements under G. L. c. 233, § 82, as substantive evidence.

The judge's order granting the petition to dispense with consent to adoption of the three children is affirmed.

*So ordered.*