NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-303

ADOPTION OF FERDINAND.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree of the Juvenile Court finding her unfit to parent her son, Ferdinand (child), and terminating her parental rights as to the child.[2] She also appeals from the judge's decision denying posttermination and postadoption visitation with the child. She argues that (1) there was a lack of clear and convincing evidence to support the termination of her parental rights; (2) the judge improperly shifted the burden to her "to prove her mental fitness"; (3) the judge abused her discretion by crediting statements of the father, given the father's abuse of the mother; and (4) the judge's decision denying posttermination and postadoption visitation was arbitrary and capricious. We affirm the decree but vacate the order denying visitation.

_____

[1] A pseudonym.

[2] The father did not appeal from the termination of his parental rights.

Discussion. 1. Evidence supporting termination. The mother first argues that there was a lack of clear and convincing evidence to support the termination of her parental rights because many of the judge's findings were clearly erroneous and because the judge impermissibly relied on hearsay evidence. We disagree.

At the outset, we consider the mother's argument that the judge relied on imbedded hearsay when she relied on statements made by the hospital social worker, which were contained in reports filed with the Department of Children and Families (DCF) pursuant to G. L. c. 119, § 51A (51A reports). DCF identified the hospital social worker by her first and last name in exhibits properly admitted at trial, including an affidavit of a DCF social worker and at least two 51A reports.[3] The Supreme Judicial Court has held that "first- and second-level hearsay contained within DCF reports and official DCF records is admissible for statements of primary fact, so long as the hearsay source is specifically identified in the document and is available for cross-examination, should the party challenging the evidence request to do so." Adoption of Luc, 484 Mass. 139, 153 (2020). As such, there was no error in the judge's reliance

---

[3] "51A reports are admissible to 'set the stage' to explain how [DCF] became involved with the family." Adoption of Chad, 94 Mass. App. Ct. 771, 778 (2019), quoting Custody of Michel, 28 Mass. App. Ct. 260, 267 (1990).

on the 51A reports that clearly identified the hospital social worker. See id.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Bea, 97 Mass. App. Ct. 416, 421-422 (2020), quoting Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a court shall consider the ability, capacity, fitness, and readiness of the child's parents . . ." (quotation and citation omitted). Adoption of Jacques, supra. "On appeal, '[w]e give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'" Adoption of Bea, supra at 422, quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).

Here, the judge heard from four witnesses[4] and reviewed forty-four exhibits over the course of four days of trial.[5]  The exhibits included, inter alia, court activity record information (CARI) reports for both the mother and the father, an affidavit from a DCF social worker with knowledge of the child's case, five court reports authored by a DCF social worker, the child's hospital records, eleven 51A reports, numerous assessments and action plans prepared by DCF, and records of the Randolph and Brockton Police Departments.

These exhibits and testimony were sufficient to support, by a fair preponderance of the evidence, the judge's findings of fact, which she described generally in the summary of her decision:

> "Mother and Father have a tumultuous relationship ridden
> with physical and sexual abuse. . . .  Mother has a
> significant history of substance abuse, mental illness and
> domestic violence. . . .  Mother has not had stable housing
> suitable for [the child] throughout the pendency of this
> case and has never demonstrated an ability to maintain a
> consistently safe home, free from domestic violence.
> Mother continues to engage in violent relationships,
> whether romantic or familial. . . .  Mother has selectively
> engaged in services [offered by DCF], attending some
> programs but refusing to avail herself of others.  Any
> services Mother engaged in have been ineffective.  She has
> never taken responsibility for her actions or acknowledged
> her issues, but instead blames others."

---

[4] The trial witnesses were (1) the mother; (2) the father; (3) an ongoing social worker employed by DCF; and (4) an adoption social worker employed by DCF.

[5] The trial occurred on four nonconsecutive days from March 12, 2021, to July 13, 2021.  Witnesses testified on March 12, June 1, and June 3, and closing arguments were heard on July 13.

4

See Adoption of Bea, 97 Mass. App. Ct. at 421-422.  These findings, in turn, supported the judge's ultimate conclusion:

> "At this time, the Court finds there is clear and convincing evidence that Mother is not fit to care for the child, nor will she be in the foreseeable future.  The Court also finds that it is in the best interests of [the child] that both Mother's and Father's parental rights be terminated, and that the child finally be afforded permanence, safety, and stability through adoption."

See id.

The mother asserts that the judge's findings of fact are so riddled with clearly erroneous findings that "[t]here was a lack of clear and convincing evidence to support a termination of [her] parental rights."  See id. at 421-422.  She points to many alleged inconsistencies in the judge's findings and conclusions. Without reciting them individually, these alleged inconsistencies amount to arguments that the evidence adduced at trial did not support the judge's findings that (1) the mother has a history of substance abuse that impacted her ability to care for the child; (2) the mother had previous interactions with the legal system; (3) the mother failed to obtain recommended prenatal care; and (4) it was, at times, difficult to ascertain the mother's compliance with her service plans (also referred to as action plans).  Concluding that there was indeed sufficient evidence to support these findings, we are not persuaded.

5

The record at trial was replete with properly admitted evidence and testimony supporting the judge's conclusion that the mother had significant issues with substance abuse that severely impacted her ability to care for the child. The child was born in June 2019. The 51A report dated June 7, 2019, stated that the mother had tested positive for norfentanyl[6] on two occasions in April 2019 and at least one of these tests was further documented in the child's medical records. The child's medical records also revealed that he was born with neonatal abstinence syndrome. Although the mother asserts that her positive test for norfentanyl was the result of skin-to-skin contact with the father, the judge was free to discredit this assertion.[7] See Adoption of Quentin, 424 Mass. 882, 886 (1997) ("the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference"). DCF also documented an incident that occurred shortly after the child's birth, in which the mother and the father were observed leaving the hospital at around 1:30 A.M. and did not return until 3:15 A.M., at which point they appeared to hospital staff to be under the influence of narcotics. The following morning,

_____

[6] A DCF trial exhibit stated that "when Norfentanyl is present in a urine tox screen, that is indicative of ingestion of fentanyl."

[7] A nurse from the mother's obstetrician's office told a DCF social worker that second-hand exposure to fentanyl cannot cause a positive test for norfentanyl, as the mother claimed.

the mother fell asleep while caring for the child.  This evidence, taken together, supported the judge's findings with respect to the mother's substance abuse and its impact on the child.  See Adoption of Jacques, 82 Mass. App. Ct. at 606.

The mother further argues that the judge erroneously concluded that she had a "criminal history spanning from 2012-2020."  Her CARI report, which was appropriately entered in evidence, states that she was charged with shoplifting in 2012 and assault and battery in 2020.  Whatever the disposition of those cases, we discern no error in the judge's characterization of her undisputed interactions with the criminal justice system as "[having] a criminal history."[8]

The mother further challenges the judge's findings that she did not obtain adequate prenatal care prior to giving birth to the child.  Although the mother claimed to a DCF social worker during a home visit that she obtained care at a clinic in Brockton before switching to a different obstetrician's office, see note 7, supra, the judge was free to discredit that claim. See Adoption of Quentin, 424 Mass. at 886.  A DCF social worker spoke with a representative of the obstetrician's office, who told her that the mother was not compliant with her prenatal

---

[8] Evidence before the judge also described several instances when the police intervened in disputes involving the mother and others, including both of the mother's parents and men with whom the mother had relationships.

7

care as she only made four appointments.  The mother's obstetrician told the same worker that the mother did not begin prenatal care until her twenty-ninth week of pregnancy.  The judge was free to credit statements by the mother's caregivers and to discredit the mother's contrary assertions.[9]  See id.

2.  Mental health issues.  Next, the mother contends that the judge improperly shifted the burden of "prov[ing] her mental fitness" onto her when the judge noted that the mother signed releases permitting her caregivers to provide only limited information about her mental health treatment to DCF.  She asserts that she has a statutory right to the confidentiality of her mental health medical records and that the judge erred by drawing a negative inference from her refusal, on the advice of her attorney, to be more forthcoming with respect to her mental health treatment.  She further asserts that DCF had an obligation to provide her with more active assistance in obtaining a psychological evaluation.  We discern no error.

_____

[9] The mother also challenges the judge's finding that "[i]n the Fall of 2019, it was difficult to confirm Mother's compliance with the service plan."  Assuming without deciding that the evidence before the judge supported a finding that DCF was aware the mother was in compliance with portions of her service plan at that time, such compliance would not end the inquiry.  There was sufficient support for termination of her parental rights for other reasons, including findings with respect to her persistent mental health issues, substance abuse, financial and housing instability, and interactions with law enforcement.

8

"The burden of proof in care and protection cases and proceedings to dispense with consent to adoption is on the petitioner to prove current parental unfitness by clear and convincing evidence." Adoption of Larry, 434 Mass. 456, 470 (2001). "The burden never shifts to the parents." Id.

Here, the burden to prove the mother's mental health issues was properly placed on DCF. DCF entered evidence showing that the mother has suffered from a history of posttraumatic stress disorder, obsessive compulsive disorder, anxiety, depression, and a chronic sleep disorder.[10] The judge was entitled to credit this evidence and to consider it in her overall evaluation of the mother's fitness. See Adoption of Jacques, 82 Mass. App. Ct. at 606. See also Adoption of Bea, 97 Mass. App. Ct. at 422. DCF provided the mother with ample opportunity to address these issues through participation in mental health treatment programs, and the mother could have rebutted DCF's allegations by showing compliance with these programs or any other efforts the mother engaged in to address and improve her overall mental health. There was no error where the judge took note of the mother's failure to participate in DCF's efforts to address her

---

[10] In her brief before this court, the mother cited her sleep disorder as an explanation for why she repeatedly fell asleep while holding the child in the hospital. Of course, credibility determinations are left to the sound discretion of the judge. See Adoption of Quentin, 424 Mass. at 886.

9

mental health challenges as part of its holistic evaluation of her fitness in the context of mental health treatment. A judge may permissibly draw an adverse inference from the refusal to provide mental health treatment records to DCF. See Adoption of Bea, supra at 419 n.9 (judge drew adverse inference from mother's refusal to provide results of psychological evaluation to DCF). Thus, there was no error with respect to any negative inference drawn from the mother's refusal to sign releases enabling DCF to monitor her mental health treatment.

The mother's argument with respect to DCF's lack of effort in helping her to obtain a psychological evaluation is also unavailing. DCF added engagement in a psychological evaluation to the mother's action plan dated October 22, 2020. Toward that end, DCF provided the mother with a referral in order to permit her to obtain such an evaluation. Thereafter, the mother reported that she had scheduled an evaluation, however, she did not sign the requisite release required for DCF to verify her claim. It was not until March 2021 that the mother signed a release that was sufficient to permit a DCF social worker to confer with her mental health provider in order to corroborate, inter alia, the mother's claims. As a result, the social worker learned that the mother had not attended her scheduled evaluation and had not made an appointment for another one because she claimed difficulty completing the intake forms. The

10

social worker reached out to the mother's provider to attempt to assist in arranging an appointment, but she was informed that the provider had dropped the mother as a client.

It is undisputed that "[w]hen a child is removed from his or her home and placed into the custody of [DCF], the department is required by statute to make ongoing 'reasonable efforts to make it possible for the child to return safely to his [or her] parent or guardian.'" Care & Protection of Rashida, 488 Mass. 217, 218 (2021), quoting G. L. c. 119, § 29C. "Its duty, however, [is] contingent upon the mother's fulfillment of her own parental responsibilities." Adoption of Mario, 43 Mass. App. Ct. 767, 774 (1997). Where the mother missed a scheduled psychological exam, failed to schedule a makeup exam, and waited at least four months to sign the release necessary to permit DCF to monitor her compliance with this portion of the family action plan, we discern no wrongdoing on the part of DCF, see Adoption of Mario, supra, nor did the judge err in considering the mother's noncompliance as part of an overall evaluation of the mother's fitness, see Adoption of Jacques, 82 Mass. App. Ct. at 606.

3. Father's testimony. Additionally, the mother argues that the judge's decision to credit the father's testimony with respect to the nature of his relationship with the mother was arbitrary and capricious because the father had a documented

11

history of domestic violence involving the mother and displayed forceful and erratic behavior during his testimony.  She further asserts that the judge erred in failing to acknowledge that she had ended her relationship with the father and in failing to recognize the difficult and cyclical nature of violent domestic relationships generally.  As the mother's argument here continues to dispute the validity of the judge's factual findings, we "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'"  Adoption of Bea, 97 Mass. App. Ct. at 422, quoting Adoption of Ilona, 459 Mass. at 59.  Again, we discern no error.

There can be no doubt that the mother and the father shared a relationship rife with domestic violence.  One of the most serious instances of alleged violence occurred in August 2020.  Unsurprisingly, the mother and the father provided conflicting testimony as to the events of the episode, in which the mother asserts she was kidnapped and raped by the father, and the father asserts the mother remained with him consensually and threatened to harm herself.  The mother was unable to provide an explanation as to how the father was able to locate her at the start of the incident and repeatedly refused to provide police with access to a possible corroborating witness.  A hotel guest saw the mother chase the father out of a hotel room, and the

mother was observed hanging onto the father's car door as he attempted to drive away. The judge noted that the father was convicted of kidnapping, assault by means of a dangerous weapon, and violating a restraining order. However, she credited the father's testimony that the incident began when the mother initiated contact with him. Given these facts, we discern no error in the judge's assessment of the mother's and the father's credibility regarding the competing testimony. See Adoption of Quentin, 424 Mass. at 886.

4. Visitation. Finally, the mother challenges the judge's decision not to order posttermination or postadoption contact with the child.

Following the trial, on July 29, 2021, the judge issued an "Order of Adjudication and Issuance of Decrees," in which she found "[t]hat, given the lack of an identified adoptive resource at this time, it is in the child's best interest to maintain contact with his mother," and ordered "post termination contact of a minimum of two visits per year between mother and child." On October 28, 2021, however, the judge issued her "Findings, Adjudication, Commitment Orders, and Order to Issue Decrees," finding, inter alia,

> "no evidence to suggest visits with Mother would be in [the child's] best interest. The Court finds that Mother's lack of cooperation with the Department, refusal to consistently engage in or benefit from services, failure to acknowledge substance abuse issues, housing instability, and

13

inconsistency in visitation with [the child] are significant factors in concluding that post-termination/post-adoption contact is not in [the child's] best interest."

On the record before us, we are unable to reconcile the discrepancy in the judge's July 29 and October 28 decisions.[11] Contrast Adoption of Edgar, 67 Mass. App. Ct. 368, 372-373 (2006) (judge's revised order denying visitation reflected "changed circumstances and evolving best interests" of children).  We therefore remand for a clarification of the posttermination and postadoption order of visitation.  In light of the passage of time, the judge may take additional evidence to determine the current best interests of the child.

Conclusion.  The decree is affirmed.  The order of posttermination and postadoption visitation is vacated and the matter is remanded for further proceedings consistent with this memorandum and order.

So ordered.

By the Court (Meade,
  Desmond & Hand, JJ.[12]),

Joseph F. Stanton
Clerk

Entered:  July 21, 2023.

---

[11] The judge recognized in both decisions that as of the end of the trial, there was no preadoptive home for the child.
[12] The panelists are listed in order of seniority.

14