NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-588

ADOPTION OF GINO.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a Juvenile Court judge terminated the mother's parental rights to her youngest child, Gino.  On appeal, the mother contends that the Department of Children and Families (department) failed to demonstrate by clear and convincing evidence that the mother was unfit to assume parental responsibility, and that the unfitness was likely to continue into the indefinite future.  We affirm.

Background.  The mother, thirty-two years old at the time of trial, dropped out of the ninth grade and suffers from diagnosed mental health issues, including bipolar disorder, attention deficit hyperactivity disorder, major depression, anxiety, posttraumatic stress disorder, and intellectual impairment.  She also is a client of the Department of

---

[1] A pseudonym.

Development Services (DDS), which offers support to adults with intellectual or developmental disabilities. A DDS program enables her to reside with a host family in the community. In addition, she receives benefits through Social Security and food assistance through SNAP. She has experienced a history of unemployment and housing insecurity, and domestic violence witnessed by the child.

Due to concerns of neglect, the mother does not have custody of any of her four children. Her oldest son, born in 2011, has been in the custody of his father since 2013. Her middle two sons, born in 2016 and 2018, respectively, were removed from mother's care in 2018, and her parental rights were terminated three years later. She gave birth to her youngest son, Gino, the subject of the termination decree here, in September 2020. As to Gino, department involvement began two months after his birth, when he was diagnosed with "failure to thrive." A report filed pursuant to G. L. c. 119, § 51A (51A report), alleged that the mother neglected the child due to concerns surrounding the child being underweight. The child also suffered from additional conditions, including extra digits on his hands (corrected shortly after birth), a heart murmur, and he later exhibited delays in walking and speech. The department investigated the allegation of neglect, substantiated the concern, and opened a case for services.

2

On March 25, 2022, the event precipitating department custody of the child occurred when the mother allegedly brandished a knife and threatened her DDS foster parents during an argument when the child (then eighteen months old) was present.  The police arrested the mother and charged her with assault by means of a dangerous weapon, and the department assumed emergency custody of the child.  The mother's foster parents obtained a restraining order against her, and she became homeless.

With the child in department custody, concerns remained about his weight and development.  The department filed a care and protection petition on March 28, 2022.  On March 29, the department filed for temporary custody, and the mother waived her rights at the hearing the following day.  The child's foster parent discovered a tongue-tie that impacted his ability to speak.  The child required surgery to correct the tongue-tie, but if the condition had been noticed when the child was younger, an in-office procedure could have obviated the need for surgery.  He also required surgery to widen his urethral opening.  The child continued to improve his mobility issues and continued to require speech therapy.  His preschool program included an individualized education program, and he showed progress in dealing with bouts of emotional dysregulation and tantrums.  The child's "particularized needs are significant and

3

will likely require extraordinary attentiveness and understanding on the part of his caregiver."

On January 3, 2024, following a trial at which the mother testified, a judge found the mother (and unnamed father) unfit and the child in need of care and protection. The judge approved the department's plan for adoption of the child by his current foster mother. The judge also determined that posttermination and postadoption contact between the mother and the child would be in his best interests, but the judge declined to enter orders as to the frequency and extent of the contact. The child has lived with his current foster (now preadoptive) mother since May 2022.

Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the child's parents.'" Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting G. L. c. 210, § 3 (c). "We give substantial deference to a judge's

4

decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). "[D]issatisfaction with the judge's weighing of the evidence" is not a sufficient basis to warrant relief on appeal. Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

We disagree with the mother's claim that the department's case "rested on ill-defined concerns" that amounted to "smoke without fire." To the contrary, the judge exhaustively considered the factors set forth in G. L. c. 119, § 26, and G. L. c. 210, § 3 (c), including the best interests of the child, in making his decision. Of particular note, the judge concluded that the mother (1) lacked insight into the reasons for the department's initial and ongoing concerns, (2) demonstrated extensive housing and employment instability, (3) lacked insight and understanding of the child's medical needs and the care required to address them, (4) failed to identify and acknowledge the child's need for ongoing intensive services, (5) failed to maintain engagement in supportive services, (6) failed to consistently attend and be prepared for parent-child visits, (7) refused to provide any information regarding her intellectual disability to enable the department to address her needs, and (8) failed to place the child's needs above her own.

5

We discern no error or abuse of discretion and conclude that the evidence supported the judge's findings and ultimate conclusions. See Adoption of Jacques, 82 Mass. App. Ct. at 606.

Cognitive limitations. The record contradicts the mother's contention that the judge found her unfit merely "because of her cognitive limitations." This contention is at odds with the judge's comprehensive findings and conclusions as well as the judge's cautionary note that he "considered the evidence in the aggregate, and ha[d] not given conclusive weight to any single component standing alone." The judge's conclusions show his concern was not with cognitive limitations per se, but with the mother's "lack of insight regarding her mental health history and intellectual disability." In particular, she was "not . . . forthright with information about her disability," and she "hampered the Department's ability to understand[] her needs" and provide appropriate services. She identified "stable housing as the only obstacle she needs to overcome."

The record is replete with examples where the mother's lack of insight into her own limitations impaired her ability to understand and meet the child's basic needs. While acknowledging that the mother brought the child to all his medical appointments, the judge found that the mother ultimately "did not follow instructions and/or recommendations from providers, with attendant consequences on [the child's]

6

health/wellbeing."  The judge also noted, "Despite contrary reports, Mother also represented that the baby consistently gained weight, never lost weight, and was never underweight." When the child was two months old, the mother disclosed that he cried every two hours after feeding, but she would insist on waiting three to four hours to feed him.  See Adoption of Oliver, 28 Mass. App. Ct. 620, 625 (1990) (parent found unfit where infant hospitalized for inability to gain weight and parent showed "no comprehension of his problems and does not acknowledge that he has problems").  Also, after attending the child's medical appointments, the mother still lacked insight into his medical needs as the mother called the nutrition plan formulated by the Grow Clinic "useless," and independently stopped giving the child appropriate supplemental food.  The judge expressly found that the mother "continues to demonstrate a lack of insight and understanding of [the child's] medical needs despite attending the majority of his appointments, and it is unclear whether she would be willing and/or able to follow his [health] provider's instructions."  Given that the mother "still does not agree with [the child's] diagnosis of failure to thrive" or that his small size was not due to genetics alone, but rather was due to his diet and nutritional intake, the evidence supported the judge's unfitness determination.  See Adoption of Dora, 52 Mass. App. Ct. 472, 478 (2001) (noting

7

failure to heed medical advice when child was ill as evidence of parental unfitness).

Employment and housing instability. We disagree with the mother's further assertion that the judge's finding regarding her inability to secure a stable home environment was unsupported by the evidence. "While homelessness, poverty, and financial instability alone are not sufficient to terminate a person's parental rights, they are proper considerations in an unfitness determination." Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018). Here, the judge properly considered these factors as part of his overall analysis, and his findings and conclusions are supported by the evidence. For the majority of her adult life, the mother has been unemployed and dependent on individuals and service providers for housing. While pregnant with the child, the mother obtained housing in a DDS mentor home, and she remained there after the child's birth. Unfortunately, the mother disrupted this placement when she threatened her host family with a knife, and she then became homeless. Since that incident, the mother has struggled to maintain stable housing, moving between shelters, homes of family and friends, and additional DDS home placements. See Adoption of Vito, 431 Mass. 550, 555 (2000) (inadequate housing properly considered along with other evidence of unfitness).

8

The judge did consider the mother's most recent move into DDS housing at the time of trial. The judge concluded, however, that it was "unclear whether her current DDS placement is able and/or willing to accommodate placement of [the child]." As the judge noted, the mother did not provide her social worker with her current address or allow the department to view the residence and conduct a home visit to assess its appropriateness for placement of the child. See Adoption of Yvonne, 99 Mass. App. Ct. 574, 581 (2021) (judge properly considered housing instability where the department was "unable to verify the mother's living situation or conduct home visits"). Moreover, the judge was not required to give greater weight to a current housing placement of three months when balanced against a long history of unstable housing. See Adoption of Abigail, 23 Mass. App. Ct. 191, 196 (1986) ("A past pattern of behavior is . . . not irrelevant; it has prognostic value"). Thus, there was ample evidence for the judge to find that the mother's housing instability contributed to her current parental unfitness.

Child visits. The mother next faults the judge for his "wholly unreasonable" inferences drawn from the mother's failure to avail herself of two "day passes" to visit with the child. We disagree. The day pass is designed to provide "an opportunity [for the parent] to demonstrate her ability to be a full-time caregiver for [the child] moving forward." The day-

9

pass issue was just one of many instances cited by the judge as evidence showing a lack of the mother's engagement with the child:  she frequently arrived late to visits despite being unemployed; she failed to bring diapers, wipes, and nutritional food to visits; and she needed to be reminded to change the child's diaper during visits.  See Adoption of Frederick, 405 Mass. 1, 7 (1989) (mother's inability to engage or interact with child during visits factored into unfitness); Adoption of Darla, 56 Mass. App. Ct. 519, 522 (2002) (unfitness shown by failure of parents to visit child).

We do not read the judge's findings as holding the mother's financial circumstances against her regarding the day passes. Instead, the judge expressly "recognize[d] that Mother has a limited income" but she "was not able to identify or ask for specific supports from the Department or service providers to enable her" to spend time with the child.  The judge further noted that the department "worked extensively" with the mother to make the day pass work and agreed to provide her with a stroller, car seat, and lunch box to ensure a successful visit. Her only obligation was to "formulate a plan" (including pick up, drop off, and nap times) to care for him from 9 A.M. to 5 P.M.  She produced no plan and pulled the plug on the visit at the last minute, protesting that she needed one hundred dollars for travel and food.  The department provided a second

opportunity for a day pass, but the mother did not produce any plan, and the day pass did not go forward.  The judge could properly consider the day-pass issue in evaluating whether the mother had the "capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993).

Action plan.  Next, we turn to the mother's claims regarding her action plan compliance.  First, she contends that the judge erred by attaching any significance to her failure to complete a neuropsychological evaluation, because that task was removed from the action plan.  Second, she contends that parenting classes should not have been included in the action plan.

We agree with the mother that the department removed the neuropsychological evaluation from the action plan.  The judge's findings, supported by the record, so indicate:  "In August 2023, Mother's Action Plan was updated and the task requesting she complete a neuropsychological evaluation was removed."  We need not decide whether this factual finding precluded the judge from concluding that the mother's failure to complete the neuropsychological evaluation indicated, as the judge put it, that she "resisted or outright refused some services outlined in her Action Plans."  Even if the judge erred, "there was no resulting prejudice."  Adoption of Luc, 484 Mass. 139, 148

11

(2020). See Adoption of Eden, 88 Mass. App. Ct. 293, 297 (2015) ("where a decision terminating parental rights contains a small number of minor factual errors, we may nonetheless affirm the decree without recourse to a remand to the trial court"). Because of the extensive evidence supporting unfitness, an isolated error does not require remand of this case to the trial court.

As to mother's failure to take parenting classes, we do not agree that the judge should have disregarded the mother's failure to complete this task in light of the record before him. The parenting class was part of the action plan, and the "failure to follow service plan tasks . . . may be relevant to determining parental unfitness." Adoption of Leland, 65 Mass. App. Ct. 580, 585 (2006). Beyond that consideration, the judge found that a parenting class would have been helpful for the mother to understand the child's milestones, medical needs, early intervention involvement, "challenges, speech and language needs, and overall development." The judge properly considered the mother's resistance to parenting classes, and the weight he assigned to that evidence was within his discretion. See Adoption of Quentin, 424 Mass. at 886 n.3.

Even if, as the mother contends, she substantially complied with all other action plan tasks, we discern no error by the judge. Indeed, the judge credited testimony and reports

12

specifically recognizing that the mother consistently engaged in individual therapy and worked with family stabilization services.  Despite her participation, the mother did not show progress in understanding her shortcomings and stated "repeatedly that she is an 'awesome parent' and the only thing she needs to improve upon is finding stable housing."  Even though the mother engaged in some services, the judge concluded that the mother's participation did not necessarily translate into an understanding of her parenting deficiencies.  See Care & Protection of Martha, 407 Mass. 319, 328 (1990).  We discern no error in this determination.  The judge was not obliged to believe that the parenting skills of the mother had improved simply because she cooperated with the department or showed good intentions.  See Adoption of Lorna, 46 Mass. App. Ct. 134, 143 (1999).

Future unfitness.  In terminating parental rights, it is also "appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (citation omitted).  Care & Protection of Zeb, 489 Mass. 783, 788 (2022).  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Adoption of Ilona, 459 Mass. at 60.

13

As evidence of her temporary unfitness, the mother points to a line in a twenty-three page report of an expert clinician noting that the mother "is capable of providing for [the child's] basic needs with strong social support."  The clinician's statement is qualified by the crucial next sentence: "However, she doesn't acknowledge that support is needed in caring for a child."  Evidence before the judge demonstrated that the mother is resistant to support services because she does not believe that she needs help parenting.  See Adoption of Luc, 484 Mass. at 146-147 (failure to recognize need for or to engage consistently in treatment is relevant to determination of unfitness).  Thus, even though evidence shows that the mother loves the child, made efforts to participate in many department services, and had some parenting strengths, the record supports the judge's determination that the mother is unable to

comprehend the necessary steps towards obtaining and maintaining a safe environment for her child and that the mother "will remain unfit indefinitely."

<u>Decree affirmed</u>.

By the Court (Meade, Sacks & Hodgens, JJ.[2]),

Paul Little

Clerk

Entered:  February 11, 2025.

---

[2] The panelists are listed in order of seniority.