NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-388

ADOPTION OF FITCH.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father contests the judge's post-trial determination that the father was unfit and the termination of his parental rights to his son, Fitch, age six.  We affirm.

Background.  We summarize the trial judge's findings of fact, supplemented by uncontroverted evidence from the record, reserving certain facts for later discussion.  Fitch was born in May 2019, the third child of his parents, who lost custody of both older children.[2]  Fitch was born substance exposed.  The Department of Children and Families (department) filed its first petition in February 2021.  The petition was based on the mother's arrest for a controlled substance offense, missed

---

[1] The child's name is a pseudonym.

[2] The mother, who was also named in the care and protection petition, consented to Fitch's adoption during the pendency of the trial.  She is not a party to this appeal.

medical appointments for Fitch, and the family's history with the department. The parents were not living together at the time. Fitch was allowed to remain with the mother subject to conditions, including a condition barring the father from being an unsupervised or sole caretaker of Fitch. Because of the father's record of domestic abuse and ongoing criminal engagement, the mother had a safety plan that limited the father's ability to visit with Fitch.

The Department drafted an action plan for the family effective April 13, 2021, to October 13, 2021. The father avoided contact and failed to engage with the department through May, July, September, and most of October 2021. He did not have consistent visits or contact with Fitch from May through at least December 2021. The father neither completed the recommended action plan items nor engaged with the department to update his action plan until after he was incarcerated in April 2022.

In late October 2021, the father agreed to meet with the department and, at the time, reported that he was living in a shelter. He had also lacked housing during the preceding months. In November, however, the father failed to appear for the scheduled meeting with a department worker and, as a result, the department remained unable to conduct the father's

2

assessment. He stayed out of contact with the department through at least March 2022; in June of that year, the department met with the father at a house of correction, where he had been incarcerated since April 2022. It is unclear from the findings how the department became aware that he was incarcerated.

In July 2022 the department contacted the jail to schedule virtual visits between Fitch and the father. But, days later, the father was transferred to the New York prison system to serve a three-year sentence and remained there when trial began. Once the father was incarcerated, he had very little contact with Fitch. Virtual visits were unsuccessful because they required that the mother (who had custody of Fitch) pay a fee and supervise the visits, both of which she could not or would not do. Fitch had telephone contact with the father between May and July 2022, and the father sent letters and photos to Fitch. As of December 2022, the department had no contact with the father, who remained incarcerated in an unknown New York facility on unknown charges. Until June 2023, the department did not know where the father was in prison. In June 2023, the department took custody of Fitch after learning that the mother's abusive partner was living with her, and that he and the mother were misusing controlled substances. Fitch has been

3

in department custody since then. As of October 2023, the father had not visited with Fitch for "a long time" before Fitch's second removal.

The department regained contact with the father in August 2023 when, through counsel, he requested an update on Fitch's placement and put forward his cousin in Virginia as a potential adoptive resource for Fitch. The department initiated the process through the Interstate Compact on Placement of Children (ICPC), and the paternal cousin was eventually approved as an adoptive resource for Fitch; Fitch has been in Virginia since July 2024.

In addition to the charges for which the father was incarcerated in New York, he has an extensive criminal history in Massachusetts. He has been incarcerated for offenses including larceny, assault and battery (including assault with a dangerous weapon), intimidation, and drug charges. He was also named in four abuse prevention orders in which the mother was the plaintiff.

The judge concluded that the father had "no meaningful bond with the child. He did not make any inquiries as to the child's wellbeing while Fitch was in substitute placement. The court [did] not credit any assertion that [the father] made meaningful efforts to engage with the Department, noting that

4

[the father] had ample time and access to his counselors at the facilities where he was held."  The judge determined that the father was "largely absent from the child's life."

The judge further concluded that the father exhibited questionable judgment about what was in Fitch's best interests -- he engaged in domestic violence toward the mother, resulting in the entry of multiple 209A orders to protect the mother, as well as the safety plan noted above, and acknowledged that the mother's partner had exposed Fitch to both domestic violence and substance misuse, but still believed that Fitch could safely be with the mother and supported that placement.

Discussion.  The father asserts that the department failed to make reasonable efforts to reunite him with Fitch and that this failure tainted the judge's best interests analysis.  We are not persuaded.[3]

When reviewing a judge's decision to terminate parental rights, we "afford deference to the judge's assessment of the weight of the evidence and the credibility of the witnesses, as

---

[3] The department asserts that the father waived the reasonable efforts argument by failing to raise it at or before trial.  See Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021) (department must have "opportunity to make accommodations while the case is pending").  We agree that the father could and should have more forcefully made and preserved this argument, but we exercise our discretion to consider it.  See, e.g., Adoption of West, 97 Mass. App. Ct. 238, 242, 245 (2020).

well as to the judge's determination of the child's best interests, reversing only if there is clear error or abuse of discretion." Adoption of Jacob, 99 Mass. App. Ct. 258, 266 (2021). A judge's decision to terminate parental rights must be supported by "clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of the evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Arianne, 104 Mass. App. Ct. 716, 720 (2024), quoting Adoption of Xarissa, 99 Mass. App. Ct. 610, 615 (2021).

"Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). See Adoption of Quentin, 424 Mass. 882, 887 (1997) ("judge may consider whether parental behavior adversely affects the child"). Having considered the parties' arguments and reviewed the extensive record, we see no reason to disturb the judge's finding of unfitness.

We are unpersuaded by the father's argument that the department failed to make reasonable efforts. The evidence in the record supports a determination, by clear and convincing evidence, that even before the father was incarcerated, he

rarely saw or engaged with Fitch. At some points this resulted (at least in part) from the mother's safety plan, but that plan was a response to the father's abuse and, thus, his doing. Cf. Adoption of Serge, 52 Mass. App. Ct. 1, 8 (2001) (judge may consider fact that parent was physically unavailable to child due to parent's substance misuse or incarceration).

The father did not engage with the department, did not make progress on his action plan, and did not make efforts to have a relationship with Fitch. "Evidence of parents' refusal to cooperate with the department, including failure to maintain service plans . . . is relevant to the determination of unfitness." Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005). While the father was incarcerated in New York, he did not request visitation or communicate with the department for over a year; indeed, the department remained unaware of the father's whereabouts during that time. The father could have remedied this but did not. Although the father maintained that he tried to contact the department, the judge explicitly did not credit his assertions that he (1) attempted to contact the department himself and through counsel, and (2) wanted to start working with the department. We will not disturb this credibility finding. See, e.g., Custody of Eleanor, 414 Mass. 795, 799 (1993). This is not a case where the father's

incarceration abruptly interrupted ongoing communication with the department; rather, beginning with the earliest involvement by the department, the father engaged only sporadically.

The evidence amply supported the judge's determination that the department met its obligations and "complied with its duty to make 'reasonable efforts . . . to prevent or eliminate the need for removal [of the children] from the home.'" Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting G. L. c. 119, § 29C. See Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010) (parent's delay in obtaining therapy undermined claim that department failed to make reasonable efforts ); Adoption of Eduardo, 57 Mass. App. Ct. 278, 282 (2003) ("Because the [parent] failed to make use of the services offered to strengthen and then reunify [the] family and denied [parent's] mental health needs by refusing both evaluation and treatment, [parent] cannot successfully argue that [the department's] reasonable efforts failed to accommodate [needs] or to strengthen" family).

Although it is evident from the record and the judge's careful and detailed findings that the father made efforts during his incarceration to address his substance-use disorder, the judge appropriately found these efforts did not support maintaining his parental rights. The judge credited the

father's statements that he completed a substance abuse program, was engaged in Suboxone treatment, and engaged in parenting classes. While acknowledging these commendable efforts, the judge did not credit the father's assertions that he "sufficiently attempted to cooperate" with his assigned social worker while incarcerated in New York or that his incarceration or engagement in services during his incarceration rehabilitated him, prepared him to parent Fitch, or resolved the issues that led to Fitch's being in the care of the department. "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60. The judge was "entitled to consider the evidence of [the father's] improvements within the context of [his] earlier and continuing deficits." Adoption of Jacques, 82 Mass. App. Ct. 601, 608 (2012). As this court recognized in Jacques, "[w]eighing strengths against weaknesses is within the core competency of the trial judge, who has the benefit not only of the evidence, but of seeing and assessing the parents themselves." Id. at 608. Here, Fitch has special needs and is extremely active and nothing in the record refutes the judge's finding that the father was uninvolved with Fitch's

9

services, never inquired about his needs, and had no practical understanding or knowledge of how to meet Fitch's specialized needs.

The judge was "not required to grant the father an indefinite opportunity for reform," and considering the evidence that the father's unfitness was not temporary, the judge properly determined "that the child's welfare would be best served by ending all legal relations between parent and child." Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012).

Decree affirmed.

By the Court (Hershfang, Hodgens & Smyth, JJ.[4]),

Clerk

Entered:    January 2, 2026.

---

[4] The panelists are listed in order of seniority.